2024 WI App 46

# COURT OF APPEALS
## DECISION
## DATED AND FILED

### July 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal No.    2023AP1350** | Cir. Ct. No.  2023CV1451 |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT I** |

---

MORGAN HESS, AS EXECUTIVE DIRECTOR, ASSEMBLY DEMOCRATIC CAMPAIGN COMMITTEE,

      PLAINTIFF-APPELLANT,

  V.

WISCONSIN ELECTIONS COMMISSION,

      DEFENDANT-RESPONDENT,

PAUL MELOTIK,

      INTERVENOR-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: STEPHEN E. EHLKE, Judge. *Affirmed*.

Before White, C.J., Donald, P.J., and Colón, J.

¶1    COLÓN, J.  Morgan Hess, as Executive Director of the Assembly Democratic Campaign Committee, appeals from an order of the circuit court for Dane County affirming a decision of the Wisconsin Elections Commission (WEC) accepting the nomination papers submitted by Paul Melotik and placing his name on the ballot for a special election held on July 18, 2023, to fill a vacant seat in Wisconsin Assembly District 24.  For the reasons set forth below, we affirm.

## BACKGROUND

¶2    By Executive Order No. 198, Governor Tony Evers called for a special election to fill a vacant seat in Assembly District 24.  In order to be placed on the ballot, Melotik submitted nomination papers to WEC on May 23, 2023, containing 369 signatures.

¶3    On May 26, 2023, Hess filed a verified complaint with WEC pursuant to WIS. STAT. § 5.06 (2021-22).[1]  In the complaint, she challenged several of the signatures submitted by Melotik, and she contended that defects in the resolution of the header, the signatory/elector certification, and the circulator certification of the nomination papers caused words on the papers to be obscured, blurry, or missing, thereby resulting in a failure to comply with mandatory statutory requirements for the content of these sections of the nomination papers. In all, Hess argued that Melotik submitted only 75 signatures that complied with the statutory requirements, and she argued that 294 of the signatures failed to comply with those requirements because of the defects she identified in the nomination papers.

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4 Melotik responded to Hess's complaint, and with his response, he submitted affidavits from himself and two other circulators stating "I knew (to the best of my knowledge) that each elector signing the nomination form was [a proper elector]." Melotik further explained that any alleged defects in his nomination papers related to obscured, blurry, or missing words were "simply the result of poor photo copying and creases in the nomination form."

¶5 Prior to a hearing on the matter, WEC staff reviewed Melotik's nomination papers, and recommended that WEC approve 352 of the signatures and approve Melotik's name for placement on the ballot. As to the alleged defects in Melotik's nomination papers, the staff recommendation stated, "The missing letters and words are apparent on the face of the nomination papers, however, staff determined that, with one exception, the nomination papers were substantially compliant, and that the missing letters and words did not eliminate anything that was essential to a statutory requirement."

¶6 On June 1, 2023, WEC held a hearing on Hess's complaint, and WEC accepted its staff recommendation and rejected Hess's challenge. At the hearing, WEC staff addressed the challenge and broke the challenge into two parts: (1) a "normal process for challenges" to individual signature lines and (2) the "second part … relate[d] to the form of the nomination paper itself and the lack of information appearing on the form." As to the second part of the challenge, WEC staff described:

> [T]he nomination papers here are not in pristine condition, they certainly do have issues. They are missing letters and they are missing individual words. However, in almost all cases, after, you know, staff reviewed every single certification of circulator, every single certification of signatory, and every header on every paper, we did not believe that any essential information was missing so that someone signing it would have understood what they were

> signing and would have been able to see every statutory, statutorily required piece of information on it.

WEC ultimately accepted 342 of Melotik's signatures and placed Melotik's name on the ballot.[2]

¶7    On June 8, 2023, Hess sought review in the Dane County Circuit Court pursuant to WIS. STAT. § 5.06(8), and following briefing by the parties, the circuit court issued a written decision on June 15, 2023, affirming WEC's decision. The circuit court found that the statutory requirements at issue were "directory" and, therefore, WEC did not err when it determined that Melotik's nomination papers "substantially complied" with those requirements.

¶8    Hess appeals. However, we note that, during the pendency of these proceedings, the special election was held on July 18, 2023, as scheduled, and Melotik was elected to fill the vacant seat.

## DISCUSSION

¶9    On appeal, the parties raise several main arguments. As a threshold matter, the parties dispute whether this appeal is moot as a result of the completion of the special election and Melotik's election to the vacant seat. Mootness aside, the parties then dispute whether WEC committed several errors in evaluating and ultimately accepting Melotik's nomination papers, including whether WEC erroneously applied a substantial compliance standard in accepting the alleged defects in Melotik's nomination papers, erroneously applied WIS. STAT. § 5.01(1) to a challenge to nomination papers, and whether the language in the subsequent

---

[2] At the hearing, WEC identified an additional ten signatures that did not comply with the requirements.

4

affidavits reneged the certification originally provided by the circulators on the nomination papers. WEC further raises an argument that Hess lacks standing.

### I. Standard of Review for WEC's Decision

¶10 Hess filed a verified compliant with WEC pursuant to WIS. STAT. § 5.06. Upon review under § 5.06, the court "may not conduct a *de novo* proceeding with respect to any findings of fact or factual matters upon which the commission has made a determination, or could have made a determination[.]" Sec. 5.06(9) (emphasis added). Additionally, the court "shall summarily hear and determine all contested issues of law and shall affirm, reverse or modify the determination" and "according due weight to the experience, technical competence and specialized knowledge" of WEC "pursuant to the applicable standards for review of agency decisions under [WIS. STAT. § 227.57]." Sec. 5.06(9). We "shall affirm" WEC's decision unless we find "a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief." Sec. 227.57(2).

### II. Mootness

¶11 "An issue is moot when its resolution will have no practical effect on the underlying controversy." *PRN Assocs., LLC v. DOA*, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559. We generally decline to address the merits of an issue that is moot. *Id.*, ¶29. However, we may address a moot issue if it falls under one of the following exceptions:

> (1) the issue is of great public importance; (2) the issue involves the constitutionality of a statute; (3) the issue arises often and a decision from this court is essential; (4) the issue is likely to recur and must be resolved to avoid uncertainty; or (5) the issue is likely of repetition and evades review.

*Marathon County v. D.K.*, 2020 WI 8, ¶19, 390 Wis. 2d 50, 937 N.W.2d 901. We review mootness independently. *PRN Assocs., LLC*, 317 Wis. 2d 656, ¶25.

¶12    Hess argues that the present issue falls within an exception to the mootness doctrine, and she focuses her argument on the fifth exception—whether the issue is likely of repetition and evades review.[3]   She contends that "the timeliness and importance of elections cases often make them inherently appropriate for judicial review" and "ballot-access challenges occur regularly with each election, and are governed by aggressive, statutory deadlines."

¶13    We conclude that this case falls under the fifth exception.  The parties here argue over WEC's acceptance of Melotik's nomination papers, and the process of submitting, reviewing, and accepting nomination papers for ballot access requires a quick turnaround time so that ballots may be prepared in advance of the election.  *See* WIS. STAT. § 8.50(3).  As a result, challenges to nomination papers are likely to evade court review when they arise because the nomination papers will be submitted, reviewed, and accepted, and the election will be held prior to the resolution of any court proceedings.

¶14    Additionally, while the specific defects alleged in Melotik's nomination papers related to poor photocopying obscuring and blurring words on the nomination papers and affidavit language found in a subsequent affidavit may not repeat itself in an identical manner, the issues involving the statutes governing review and acceptance of nomination papers such as this one are likely to repeat

---

[3] Hess additionally argues that the present issue falls under the first, third, and fourth exceptions; however, we decline to address these exceptions given the general and undeveloped nature of the argument made. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

themselves. "The construction of the statute [and] an understanding of its operation … will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held." **Storer v. Brown**, 415 U.S. 724, 737 n.8 (1974). We, therefore, conclude that the fifth exception to the mootness doctrine applies to Hess's appeal.

### III. Standing

¶15 WEC argues that Hess lacks standing to pursue her case. Specifically, WEC argues that Hess lacks standing under WIS. STAT. § 5.06(8) because she was not herself a candidate in the election and was not "aggrieved" by WEC's decision to place Melotik on the ballot.[4] We disagree.

¶16 Standing is a two-part inquiry. **Friends of Black River Forest v. Kohler Co.**, 2022 WI 52, ¶18, 402 Wis. 2d 587, 977 N.W.2d 342. We first ask whether the agency decision directly caused injury to the interest asserted. **Id.** Second, we ask whether the interest asserted is recognized by law. **Id.** Standing is a question of law that we review independently. **Id.**, ¶10. We liberally construe the law of standing. **Id.**, ¶19.

¶17 Under WIS. STAT. § 5.06(1), "any elector" may file a complaint with WEC if the elector believes that a decision or action of an election official is contrary to law or an abuse of discretion "with respect to any matter concerning

---

[4] WEC acknowledges that it raised this standing argument for the first time on appeal in its response brief, and we typically decline to address arguments raised for the first time on appeal. *See* **State v. Ward**, 2000 WI 3, ¶45, 231 Wis. 2d 723, 604 N.W.2d 517 ("Although it is the general rule that issues not raised or considered in the circuit court will not be considered for the first time on appeal, this rule is not absolute."). In Hess's reply, she urges that we address WEC's standing argument. Thus, we address WEC's standing argument despite the fact that it raised this argument for the first time on appeal.

nominations, qualifications of candidates, voting qualifications, … recall, ballot preparation, election administration, or conduct of elections." Upon receipt of such a complaint, WEC is authorized to investigate and issue a decision on the complaint. Sec. 5.06(4), (6). Importantly, "[a]ny election official or complainant who is aggrieved by an order issued under sub. (6) may appeal the decision of the commission to circuit court for the county where the official conducts business or the complainant resides[.]" Sec. 5.06(8).

¶18 In this case, Hess filed a verified complaint with WEC under WIS. STAT. § 5.06(1), and challenged Melotik's nomination papers. WEC subsequently investigated her complaint and issued a decision dismissing her complaint under Sec. 5.06(6). Clearly, Hess qualifies as "a complainant who is aggrieved by an order issued under sub. (6)." Sec. 5.06(8). Contrary to WEC's argument, nothing in the statute restricts standing to another candidate in the election. The statute plainly states an "election official" or a "complainant," and after having filed a verified complaint with WEC under Sec. 5.06 and having received an unfavorable decision from WEC on that complaint, Hess clearly meets the qualifications of the statute as a complainant aggrieved by WEC's decision.

¶19 Consequently, we reject WEC's argument that Hess lacks standing to pursue this appeal.

## IV. The Substantial Compliance Standard

¶20 Hess argues that WEC erroneously evaluated Melotik's nomination papers using a standard of substantial compliance with the statutory requirements found in WIS. STAT. § 8.15. Rather, Hess contends that § 8.15 requires strict compliance, and Melotik's nomination papers failed to strictly comply with the requirements for the header, the signatory/elector certification, and circulator

certification of nomination papers as a result of words on the papers that were obscured, blurry, or missing due to poor photocopying. Thus, we turn to the question of whether § 8.15 requires strict compliance with these requirements.

¶21 "The interpretation of a statute is a question of law that we review *de novo*." ***E-Z Roll Off, LLC v. County of Oneida***, 2011 WI 71, ¶16, 335 Wis. 2d 720, 800 N.W.2d 421 (emphasis added); *see also* WIS. STAT. § 5.06(9); WIS. STAT. § 227.57(11) ("Upon review of an agency action or decision, the court shall accord no deference to the agency's interpretation of law.").

¶22 "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" ***State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). We give statutory language "its common, ordinary, and accepted meaning." ***Id.*** Additionally, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." ***Id.***, ¶46.

¶23 Turning to the statutes, the process for a candidate to have his or her name placed on a ballot for a special election is governed by WIS. STAT. § 8.15. WIS. STAT. § 8.50(3)(b). A candidate in an election for the assembly must file nomination papers with 200 to 400 valid signatures. Sec. 8.15(6)(d). "Only those candidates for whom nomination papers containing the necessary signatures acquired within the allotted time and filed before the deadline may have their names appear [on the ballot]." Sec. 8.15(1).

¶24 The nomination papers must, among other requirements, contain a certification from the circulator. Pursuant to WIS. STAT. § 8.15(4)(a),

9

[t]he certification of a qualified circulator stating his or her residence with street and number, if any, shall appear at the bottom of each nomination paper, stating he or she personally circulated the nomination paper and personally obtained each of the signatures; he or she knows they are electors of the ward, aldermanic district, municipality or county, as the nomination papers require; he or she knows they signed the paper with full knowledge of its content; he or she knows their respective residences given; he or she knows each signer signed on the date stated opposite his or her name; and, that he or she, the circulator, is a qualified elector of this state, or if not a qualified elector of this state, is a U.S. citizen age 18 or older who, if he or she were a resident of this state, would not be disqualified from voting under [WIS. STAT. §] 6.03; that he or she intends to support the candidate; and that he or she is aware that falsifying the certification is punishable under [WIS. STAT. §] 12.13(3)(a). The circulator shall indicate the date that he or she makes the certification next to his or her signature. The certification may be made by the candidate or any qualified circulator.

¶25    The nomination papers must also contain a header and a signatory/elector certification as described in WIS. STAT. § 8.15(5), which states:

(a) Each nomination paper shall have substantially the following words printed at the top:

I, the undersigned, request that the name of (insert candidate's last name plus first name, nickname or initial, and middle name, former legal surname, nickname or middle initial or initials if desired, but no other abbreviations or titles) residing at (insert candidate's street address) be placed on the ballot at the (general or special) election to be held on (date of election) as a candidate representing the (name of party) so that voters will have the opportunity to vote for (him or her) for the office of (name of office). I am eligible to vote in (name of jurisdiction or district in which candidate seeks office). I have not signed the nomination paper of any other candidate for the same office at this election.

(b) Each candidate shall include his or her mailing address on the candidate's nomination papers.

10

¶26 "The commission shall promulgate rules under this chapter for use by election officials in determining the validity of nomination papers and signatures thereon." WIS. STAT. § 8.07. Under this direction, WEC has established the following relevant rules for reviewing nomination papers submitted to WEC.[5]

¶27 "Each candidate for public office has the responsibility to assure that his or her nomination papers are prepared, circulated, signed, and filed in compliance with statutory and other legal requirements." WIS. ADMIN. CODE § EL 2.05(1). "Any information which appears on a nomination paper is entitled to a presumption of validity." WIS. ADMIN. CODE § EL 2.05(4). "Where any required item of information on a nomination paper is incomplete, the filing officer shall accept the information as complete if there has been substantial compliance with the law." WIS. ADMIN. CODE § EL 2.05(5). Upon receipt of a challenge, the filing officer shall apply the same standard of substantial compliance "to determine the sufficiency of nomination papers." WIS. ADMIN. CODE § EL 2.07(1).

¶28 After the review of the nomination papers is complete, "the official or agency with whom declarations of candidacy are required to be filed may refuse to place the candidate's name on the ballot if … [t]he nomination papers are not

---

[5] Following the conclusion of briefing in this case, WEC issued two emergency rules—one related to challenges to declarations of candidacy and the other related to challenges to nomination papers. *See* Em. R. 2408 (effective July 1, 2024; expiration Nov. 27, 2024); Em. R. 2409 (effective July 1, 2024; expiration Nov. 27, 2024). Despite an obligation to inform the court of new and seemingly relevant authority bearing on an issue presently before the court, neither party notified this court of these emergency rules. *See* WIS. STAT. RULE 809.19(10). Nevertheless, these rules were suspended on July 22, 2024, following a motion by Senator Steve Nash and Representative Adam Neylon made at a public hearing before the Joint Committee for Review of Administrative Rules. Thus, we ultimately do not consider the emergency rules applicable to this case.

prepared, signed, and executed as required under this chapter." WIS. STAT. § 8.30(1)(a).

¶29 Having reviewed the relevant statutes, we conclude that WIS. STAT. § 8.15 does not require the strict compliance advanced by Hess. Importantly, as described above, the legislature authorized WEC to promulgate rules "in determining the validity of nomination papers and signatures thereon." WIS. STAT. § 8.07. Under this authority, WEC promulgated WIS. ADMIN. CODE § EL 2.05(5), which specifically requires that information contained within nomination papers is considered complete if it substantially complies with the statutory requirements. By the plain language, strict compliance is not required. Furthermore, WEC has discretion to refuse to place a candidate's name on a ballot if nomination papers are not "prepared, signed, and executed" in compliance with the statutory requirements. WIS. STAT. § 8.30(1)(a).

¶30 Put in the context of the requirements found in WIS. STAT. § 8.15, WEC has discretion to accept a candidate's nomination papers in the case that the information substantially complies with the requirements of § 8.15 and has discretion to refuse to place a candidate's name on the ballot in the case that nomination papers are not properly prepared, signed, and executed with the requirements of § 8.15. Consequently, strict compliance with § 8.15 is not required in the manner Hess contends.

¶31 In arguing for strict compliance, Hess emphasizes the use of the word "shall" in WIS. STAT. § 8.15(4)(a) and § 8.15(5). We agree that the use of "shall" generally signals a mandatory requirement. *Bank of N.Y. Mellon v. Carson*, 2015 WI 15, ¶21, 361 Wis. 2d 23, 859 N.W.2d 422. However, the use of the word "shall" in this instance merely signals that certain content be present on

the nomination form, and it does not mandate a particular way, i.e. format, that the content must be presented on the nomination form. Thus, while there are content requirements for nomination papers under both § 8.15(4)(a) and § 8.15(5), how that content appears and is formatted on the nomination paper is not specified. *See State ex rel. Ahlgrimm v. State Elections Bd.*, 82 Wis. 2d 585, 596-97, 263 N.W.2d 152 (1978) ("[T]he Board [has] discretion to ignore irregularities in the actual preparation of nomination papers[.]").

¶32      Relatedly, Hess argues that substantial compliance is sufficient when evaluating the completeness of the information handwritten on the form by electors and circulators. With this, she provides the example of electors failing to check a box next to the choice of municipality provided on the nomination forms. She then argues that this is not such a case, and instead, she argues that the defects in Melotik's nomination papers arise from the process of circulating nomination papers, which requires strict compliance.

¶33      We disagree. Indeed, we fail to see how information that is obscured, blurred, or missing on a form related to poor photocopying differs from information entirely missing from a form because an elector failed to provide it. In both instances, the issues raised deal with the completeness of the information on the form, and at least in the context of words that are obscured, blurred, or missing as a result of poor photocopying, the information can be deduced from the remainder of the form. "[P]reparing, signing and executing are things that are done to nomination papers," and WEC has "discretion to ignore irregularities in the actual preparation of nomination papers." *Id.* Thus, we reject Hess's argument on this point because this case deals with nothing more than an irregularity in the preparation and execution of the nomination papers.

¶34     Turning to Melotik's nomination papers themselves, we conclude that WEC properly applied a substantial compliance standard in evaluating Melotik's nomination papers and placed his name on the ballot. Importantly, as WEC staff noted in the review of Melotik's nomination papers, the information and content required by both WIS. STAT. § 8.15(4)(a) and § 8.15(5) for the header, the signatory/elector certification, and the circulator certification were present or able to be deduced using the surrounding wording on the nomination papers that WEC accepted. While the information may not have been as clear as it could have been as a result of failures in photocopying, the required information was ultimately uncompromised and the obscured, blurry, or missing wording resulting from the poor photocopying was immaterial to meet the requirements of the statutes. In other words, while the information on the forms appeared incomplete due to poor photocopying, the required content was nonetheless available after further review.[6]    WEC, therefore, did not erroneously apply the substantial compliance standard to Melotik's nomination papers and place his name on the ballot.

## V.     Application of WIS. STAT. § 5.01(1)

¶35     WISCONSIN STAT. § 5.01(1) states, "Except as otherwise provided, chs. 5 to 12 shall be construed to give effect to the will of the electors, if that can

---

[6] For these reasons, we also reject Hess's hypothetical that a candidate could substantially comply with the requirements by submitting less than 200 signatures. Based on WEC's review of the forms, the required content was present, even if it was not a perfect copy of the form, and for that reason, WEC accepted Melotik's forms. There is, therefore, no issue here related to required information missing from a form and nonetheless being accepted by WEC under the rationale that it substantially complied despite the absence of required information.

be ascertained from the proceedings, notwithstanding informality or failure to fully comply with some of their provisions."

¶36 Hess argues that WEC erroneously applied WIS. STAT. § 5.01(1)—the "will-of-the-voters" standard—when it found that substantial compliance with statutory requirements was acceptable and approved Melotik's nomination papers and placed Melotik's name on the ballot. We disagree.

¶37 In making this argument, Hess contends that the "limited discussion" at the hearing "suggests" that WEC grounded its decision in this standard. Hess points to, for example, one commissioner's statement that "I understand you're saying that the will of the people, I think your argument is, doesn't translate into—is not an argument to weigh in favor of ballot access." Hess further points to another statement that "I sort of like our staff's approach on substantial compliance and my thoughts are that we should let the voters have an election and not take this election away."

¶38 Despite any discussion at the hearing about the application of WIS. STAT. § 5.01(1), we conclude that the record demonstrates that WEC ultimately based its decision on the substantial compliance standard that it was directed to apply pursuant to WIS. ADMIN. CODE § EL 2.07(1) and the staff recommendation, which reviewed Melotik's nomination papers for substantial compliance. Accordingly, we reject Hess's argument that WEC erroneously applied § 5.01(1) in reviewing Melotik's nomination papers. As the record demonstrates, WEC based its decision on substantial compliance and not the will of the voters.

## VI. Affidavit Language

¶39    Hess further maintains that the three affidavits Melotik submitted to WEC with his answer reneged the certification required for the nomination papers. Here, she argues that the "I knew (to the best of my knowledge)" language in the affidavits is less than the actual knowledge required under WIS. STAT. § 8.15(4)(a). We again disagree.

¶40    As stated earlier, WIS. STAT. § 8.15(4)(a) requires a certification from the circulator. As relevant to Hess's argument, the circulator must state in the certification that (1) "he or she knows [the signors] are electors of the ward"; (2) "he or she knows they signed the paper with full knowledge of its content"; (3) "he or she knows their respective residences given"; and (4) "he or she knows each signer signed on the date stated opposite his or her name." *Id.*

¶41    Notably, the circulators provided this certification on the nomination papers, namely, that they knew all these requirements of the signors, and it was on the basis of this information in the nomination papers that WEC staff reviewed Melotik's nomination papers, and WEC approved and placed Melotik's name on the ballot.

¶42    Nevertheless, we observe that Hess cites one case from Wisconsin and several from other jurisdictions for the proposition that "to the best of my knowledge" is not the same as the actual knowledge required by the statute, and we further note that several of these cases, including the one Wisconsin case, are distinguishable because the language addressed by the courts in those cases also contained the word "belief." *See McChain v. City of Fond Du Lac*, 7 Wis. 2d 286, 290, 96 N.W.2d 607 (1959) ("An affidavit on information and belief is an anomaly. It is not an affirmance on knowledge."); *America's Best Inns, Inc. v.*

16

***Best Inns of Abilene, L.P.***, 980 F.2d 1072, 1074 (7th Cir. 1992) ("[O]nly the affidavit made on personal knowledge has any value ('to the best of my knowledge and belief' is insufficient)[.]"); ***Draghi v. County of Cook***, 991 F. Supp. 1055, 1057 (N.D. Ill. 1998) ("[W]e are taught in law school (or we should be) that any statement that things are true 'to the best of [someone's] personal knowledge and belief' is really not an affidavit at all[.]" (alteration in original)).

¶43 We, therefore, reject Hess's argument that the affidavits Melotik submitted to WEC with his response in some way negated the original certification provided by the circulators as a result of their inclusion of the phrase "to the best of my knowledge."

## CONCLUSION

¶44 We conclude that Hess's appeal falls within an exception to the mootness doctrine, and we further conclude that Hess has standing to pursue this appeal. Consequently, we conclude that WEC did not erroneously evaluate Melotik's nomination papers using a standard of substantial compliance and place Melotik's name on the ballot. We further conclude that the record lacks any indication that WEC applied WIS. STAT. § 5.01 when it evaluated Melotik's nomination papers and Hess's complaint or that the language found in the affidavits submitted by Melotik and two of his circulators to WEC somehow negated the original certifications contained in the nomination papers. Accordingly, we affirm.

*By the Court.*—Order affirmed.

Recommended for publication in the official reports.