MUSCODA BRIDGE COMPANY, Appellant, vs. VILLAGE OF MUSCODA and others, imp., Respondents.

*May 6—June 20, 1927.*

*Franchises: Indeterminate permits: Public utilities: Toll bridges: Regulation of tolls: Right of state to erect free bridge.*

1. The legislature has the power to alter or repeal a franchise for the construction of a toll bridge granted by legislative act; but the intent to repeal or alter an existing franchise must be clearly expressed, and will not be implied from doubtful or ambiguous language.   p. 459.
2. Sub. (5), sec. 196.01, and sec. 196.55, Stats., specifically designating public utilities furnishing heat, light, water, power, and telephone service, the franchises of which were made indeterminate permits, apply only to the utilities specifically mentioned.   p. 459.
3. Ch. 48 of the Laws of 1911, declaring toll bridges to be public utilities, will not necessarily result in the franchise for a toll bridge becoming an indeterminate permit, in view of ch. 596, Laws of 1911, amending the franchises of certain utilities which had previously been declared public utilities so as to make the same indeterminate permits, and sec. 1797m—77, Stats. (ch. 499, Laws of 1907), giving a public utility the right to surrender its franchise and receive an indeterminate permit in lieu thereof.   p. 459.
4. A toll-bridge company, even though possessing an indeterminate permit, would not be protected from competition under sec. 196.50, Stats., limiting the right to maintain a utility without competition to utilities supplying heat, light, water, power, and telephone service.   p. 460.
5. The legislative distinction between utilities serving local communities with necessities such as water, light, heat, and power, and utilities whose bridges form part of the public highways serving all the people of the state, is proper.   p. 460.
6. The state is not required to go to the railroad commission or to any other body to secure permission to exercise its governmental function of constructing and maintaining highways over land or across the waters of its rivers, since the state has that inherent power.   p. 461.
7. Where a toll-bridge company accepted and operated under a franchise containing no engagement on the part of the state that another bridge should not be erected or improvements made that would diminish the amount of its income, the build-

ing of a free wagon bridge near a toll bridge did not result in confiscation of the property.  p. 461.

8. Regulation by the state of the rate of tolls charged does not give a toll-bridge company the exclusive right to maintain its bridge, since the toll-bridge company, by devoting its property to public use, subjected the bridge to regulation by the state.  p. 461.

APPEAL from an order of the circuit court for Dane county: AUGUST C. HOPPMANN, Circuit Judge.  *Affirmed.*

The *Muscoda Bridge Company* brought an action to restrain the village of *Muscoda,* the town of *Eagle,* the counties of Grant and Richland, and the State Highway Commission from erecting a free bridge across the Wisconsin river at *Muscoda,* Wisconsin.  From an order dissolving a temporary injunction the *Bridge Company* appealed.

In 1866 the legislature granted to the predecessor in title of the *Muscoda Bridge Company* a franchise to erect a toll bridge across the Wisconsin river at *Muscoda.*  In July, 1923, proceedings were begun for the erection of a free bridge across this river at *Muscoda.*

For the appellant there was a brief by *Kopp & Brunckhorst* of Platteville, and oral argument by *Arthur W. Kopp.*

For the respondents there was a brief by *Grady, Farnsworth & Walker* of Portage, and oral argument by *Suel O. Arnold,* assistant attorney general, and *Daniel H. Grady.*

STEVENS, J.  The franchise for the construction of the appellant's toll bridge was not exclusive.  Plaintiff bases its right to enjoin the construction of the new bridge upon the claim that it has an indeterminate permit under the public utility law and that neither the state nor any of its municipal subdivisions has the power to erect a competing bridge unless a certificate of convenience and necessity is secured authorizing the erection of such bridge.  No such certificate has been secured.

When the public utility law was passed toll bridges were

not declared to be public utilities. But by ch. 48, Laws of 1911, the statutes were so amended as to make toll bridges public utilities. But the statutes contain no legislative declaration that the franchises of toll bridges are indeterminate permits.

If the franchises of toll bridges have become indeterminate permits, that result must follow from the simple fact that these bridges were declared to be public utilities. Undoubtedly the legislature possessed the power to alter or repeal the franchise granted to the *Bridge Company's* predecessor by legislative act. But the intent to repeal or alter an existing franchise must be clearly expressed. Such intent will not be implied from doubtful or ambiguous language. No act clearly expressing such legislative intent has been passed by the legislature. When the legislature determined that existing franchises should be altered or amended under the reserved power, it clearly designated the particular public utilities whose franchises were made indeterminate permits. It left nothing to implication. It limited the exercise of the reserve power to utilities which furnish heat, light, water, power, and telephone service. Sub. (5) of sec. 196.01 and sec. 196.55 of the Statutes.

If the mere legislative declaration that a utility was a public utility necessarily resulted in the franchise of the utility becoming an indeterminate permit, there would have been no necessity for the passage of ch. 596, Laws of 1911, which altered and amended the franchises of all utilities supplying water, light, heat, power, and telephone service so as to make the same indeterminate permits, because all utilities mentioned in that act had been declared to be public utilities when the act was passed in 1907. That it was not the legislative intent to make the declaration that a utility was a public utility equivalent to the granting of an indeterminate permit is shown by the fact that sec. 1797m—77 of the Statutes (ch. 499, Laws of 1907) gave the public

utility a right to elect to surrender its franchise and receive an indeterminate permit in lieu thereof. This provision evidences a clear legislative intent not to make the granting of an indeterminate permit automatically follow the legislative declaration that a utility is a public utility. It was not until the passage of ch. 596, Laws of 1911, that the legislature exercised its reserve power to make the franchise of all companies supplying heat, light, water, power, or telephone service indeterminate permits.

The only limitation which the legislature has imposed upon the right to construct and maintain competing plants is found in sec. 196.50 of the Statutes. Again it will be noted that the right to maintain an existing utility without competition from a new plant is confined by the express terms of the statute to those utilities which supply heat, light, water, power, and telephone service. Even if the appellant possessed an indeterminate permit, it would not be protected from competition under the express terms of sec. 196.50 of the Statutes.

There is a very legitimate basis for the distinction which the legislature has made between utilities which serve local communities with such necessities as water, light, heat, and power and those utilities whose bridges form a part of the public highways that serve all the people of the state. If appellant's position is sound, it means that the legislature has committed to the appellant *Bridge Company* the function of maintaining a part of the public highways of the state for all time, or at least to the time when the state procures a certificate of convenience and necessity that will authorize the construction of such a bridge as the one here in question. In the absence of a clearly expressed legislative intent, the statutes should not be given a construction that will lead to such an unfortunate result. But the legislature has clearly expressed its intent that the state should not be hampered in this manner in the performance of one of its

most important governmental functions,—that of providing the public with highways over the land and across the rivers of the state.   The state is not required to go to the railroad commission or to any other body to secure permission to exercise its governmental function of constructing and maintaining highways over the land or across the waters of its rivers.   The state has that inherent power.

The building of a free wagon bridge near appellant's toll bridge does not result in a confiscation of appellant's property.   Appellant and its predecessors accepted and operated under a franchise which contained no engagement on the part of the state that another bridge should not be erected or that improvements should not be made that would diminish the amount of its income.   For the plainest reasons so clearly stated in *Charles River Bridge v. Warren Bridge,* 11 Pet. (36 U. S.) 420, 548–553, 9 Lawy. Ed. 773, 824–826, it must be held that the franchise of the plaintiff *Bridge Company* did not give it the right to prevent the state from building a free bridge beside its structure.   The *Bridge Company* has enjoyed the right to collect tolls of all who crossed the Wisconsin river at this point for sixty years without competition of any kind.   The fact that the state has exercised its power to regulate the rate of tolls charged does not give the appellant the exclusive right to maintain this bridge.   By devoting its property to a public use it subjected its bridge to regulation by the state.   The state acted within the realm of its well established powers when it determined to construct a free bridge at the place here in question.   The procedure taken complies with the requirements of the statute.   The trial judge was clearly right in dissolving the temporary injunction.

*By the Court.*—Order affirmed.